Judge Co alte it:
Doctor George D. Spratt, at the time of making his will, hereafter mentioned, was possessed, among other things, of an estate of lands and slaves thereon in Gloucester county, called his Bellevue estate, and which con. sisted of two plantations adjoining, as was believed and understood at that time; though since his death, a claim has been set up to a slip of land, which would now divide those plantations.
The original and largest plantation, and much the most valuable, was called Bellevue, and belonged to his father, Doctor Robert Spratt, who afterwards added thereto, by the purchase of the small plantation from one Whiting, and which therefore acquired the name of Whiting's plan-'* tation, though the whole was occupied by him as one estate.
The said Robert Spratt, the father, by his will, devised the former by the description of the “ tract formerly cal *197 led Col. Buchanan’s Dragon Quarter, and now usually called Bellevue, and which he had purchased of Col. Thomas Whiting,” to his son Robert B. Spratt; and the latter, which he describes as the “plantation in Gloucester usually called Whitings,” to his son William Spratt.
On the death of William Spratt, the plantation called Whitings descended, or was devised to his brothers Robert B. Spratt and George D. Spratt, then under age, and in the kingdom of Great Britain, as 7 understand, receiving his education. In consequence of which, one half of Whitings again became attached to the Bellevue estate, and was occupied and cultivated as a part thereof by Robert B. Spratt, who settled a portion of his slaves thereon. The other half was taken possession of by one Cosby the guardian of George D. Spratt, who settled some women and children thereon, and who cultivated the same merely for their support, he hiring out the children, as soon as they were large enough for that purpose.
On the death of Robert B. Spratt, he, by his will, dated in 1805, devised to his brother George D. Spratt, (then in London,) all his lands, slaves, houses, &c. desiring that his overseer John Ware, at Bellevue and Whitings in Gloucester, should be continued, &c. Thus the whole estate again became united in George D. Spratt, whose guardian continued the said overseer thereon, cultivating the whole as one, keeping an account of the Bellevue estate, as one estate, though the negroes theretofore settled on the Whitings plantation, both by himself and Robert B. Spratt as aforesaid, continued to occupy their former cabins thereon, but labouring indiscriminately the whole estate. Indeed, the overseer’s house on Bellevue having gone to decay, and there being a better house for him on Whitings, he resided there. On the return of George D. Spratt, he occupied the whole as one estate. Two witnesses, Peter Kemp (who had been agent for Cosby, and intimate with George D. Spratt,) and William S. Ward, (who lived with him, and had frequently been on the estate when Ware lived there) declare, the former, *198 that both Cosby and George D. Spratt, treated the whole as one estate; and both of them testify, that George D. Spratt considered and spoke of the estate as his Bellevue estate# and the slaves as his Bellevue slaves. Indeed, the whole was one estate when George D. Spr.att came to the possession thereof, and so continued until his death.
In this posture of affairs, Doctor George D. Spratt, being in Fredericksburg, and in his last illness, made his will. He gives tó his aunt F. D. all his lands, houses, slaves, stocks and furniture, during her life; and after her death, he devises the same, as follows: Amongst other things, the estate called Bellevue, in the county of Gloucester, with one half of the slaves, stocks and plantation utensils on the Bellevue estate, he devises to them, in trust, &tc. for his relation, James Fife, &c. His estate called Whitings, with one half of his slaves, stocks and plantation utensils, on the Bellevue estate, he devises to them, in trust for William Fife, &c. And then, after some personal bequests, he bequeaths to his friend Doctor James Dabney, of Gloucester, all his books, medicine and shop-furniture, and all the estate not before devised, including his gig and saddle horse.
Under this residuary clause, the appellee claims the slaves on the Whitings plantation, as well those settled thereon by Cosby, as aforesaid, as those settled thereon by Robert B. Spratt; the former and their descendants now amounting to twenty, and the latter to six; and which have been decreed to him.
The first question is, whether, under the circumstances above stated, in relation to the posture of these slaves, and their connexion with the Bellevue estate, the intention of the testator was, that those living on the Whitings part of that estate were intended as part of the trust estate for the two Fifes, or were to pass under the-residuary clause, to the appellee.
It is admitted, and it is a very correct admission, that both the clauses in regard to them must be construed together, and that if the trustees for the benefit of James Fife, *199 arc to take one half of them, that the clause in favor of William Fife must receive the same construction.
Suppose the testator had devised his estate called Bellevue, and one half the slaves, to James Fife, and the other half of the slaves to William Fife. James would have taken the whole Bellevue estate, including Whitings, and half the slaves on that estate, whether settled on the tract called Whitings, or not; and William Fife would have taken the other half of the slaves.
But the testator intended again to sever that estate, and for this purpose, he calls the one part Bellevue, and the other Whitings. But, when he speaks of his slaves, as he intended to divide them equally, and not by their residence on either of those particular portions of the estate; so to be divided, he speaks of them, as he always had done, and by the description he had always used concerning them, as his Bellevue slaves in Gloucester. This too was proper, in order to distinguish them from his slaves at Lansdoion, or elsewhere.
It may be worthy of remark, also, that the will was drawn up from notes, and the draftsman was probably ignorant of the particular location of these slaves, and thus the ambiguity, which seems to exist, may have crept in. The Fifes were his relations, and the principal objects of his bounty, and he, doubtless, intended to divide his Gloucester lands and slaves between them.
This is fortified by the special enumeration of certain subjects, then in the mind of the testator, in the residuary clause, and particularly by the words “including my gig and saddle horse;” which seem, at least, to indicate, not only that he had thus enumerated every thing he recollected, hut that lie did not intend to leave any thing unmentioned which he did recollect.
But the testator had these lands and slaves particularly in view, and in his recollection, and either intended to dispose of all the slaves on that estate in favor of the Fifes, or he did not. If he intended to leave a portion of them, *200 and so large a portion as twenty-six, unbequeathed to the Fifes, it must have been in order to die intestate as to them, f°r the purpose of giving them to the appellee by the residuary clause; and if the latter, they would, dbubtless, have been enumerated in it. They could not have been out of his mind; for had he intended, for any purpose whatever, to discriminate, or to divide, those on the Whitings plantation, from those on the Bellevue part of the estate, by using the words- “slaves, stock, &c. on the Bellevue estate,” this would shew that they were in his mind for the purpose of such discrimination, and of course, they would have been more likely to have been enumerated, than his gig and riding horse, had he intended to give them to the appellee.
In the one clause, he devises his estate called Bellevue, in Gloucester, with one half of the slaves, &.c. What slaves, and where ? His slaves at Bellevue, in Gloucester. In the other, his slaves, &c. on the Bellevue estate. What slaves had he always considered his slaves on the Bellevue estate ? All his' slaves in Gloucester, and on an estate, which, whenever united in one person, as it then was in him, was known as the Bellevue estate. The circumstance that the lots and houses in Urbanna, and a considerable estate (in remainder) were not thought of by the testator, or mentioned in the residuary clause, is no proof that the whole of these slaves were not in the testator’s mind. The most, I think, that can be said is, that having always treated and spoken of them as his Bellevue slaves, he did not perceive that his severing the real estate, according to former boundaries, and designating each portion by its accustomed name, some ambiguity might be caused by describing the slaves as he had been used to do, as belonging to, or residing on, one estate. As to the houses and lots in Urbanna, it has not been contended, as I understand, that they passed to the trustees as a portion of the Lansdoum estate adjoining.
*201 By the first clause in the will, the testator gives to his aunt, Mrs. Frances Daniel, all his lands, houses, slaves, stocks and furniture, during her natural life, and then ceeds thus; “ and after her death, I devise the same as follows, to wit; the estate called Lansdown, and that called the Reeds, in the coutily of Middlesex, and all the slaves and stock thereon, &te. I give and bequeath to my friends General John Minor and John Chew, esq. in trust, &c. for my relation Robert B. Fife.”
This estate called Lansdown adjoined, as I understand, the town of Urbanna; and some town lots were embraced within the enclosures of that estate, and which therefore, are not disputed, as being a part of that estate, and going, by the will, to the trustees. But there were other lots, with buildings on some or all of them, and amongst them the lot whereon the shop stood; which, not being so included, are claimed under the residuary clause.
This claim is mainly resisted on the ground, that though they may not have passed under the devise to the trustees, that nevertheless, from the particular wording of the residuary clause, they were not intended to be passed by it; and consequently, the appellee is not entitled to them, or their rents and profits. This proposition, if supported, might also negative his right to the slaves at Whitings, in case they too had not been considered as passing under the will, to the trustees; and might, in like manner, extend to an estate of considerable amount, consisting of lands and slaves, to which the testator was entitled in remainder, after the death of his aunt, which happened a few days after his own; which was not particularly devised in the will, and of which, it is understood, the appellee took and holds possession, under the residuary clause.
This would be, in other words, to restrain the residuary clause to personal estate altogether, and further, to such personal estate, as is of the same kind with that enumerated; so that the testator would bo considered, at all events, as dying intestate as to the real estate, to wit, the houses *202 and lots in TJrbanna, the remainder in the other estate aforesaid, and also to the slaves and other personal estate of a different kind from that enumerated in the residuary clause.
On this point, I confess, I have had considerable doubts; and more as to the personalty, than as to the realty; as an intestacy as to the latter, may perhaps, in this as in most cases of this kind, be more readily presumed.
The case of Brown v. Higgs, 4 Ves. 708, arose under a will, by which lease-hold lands were bequeathed to J. B. for such children of a nephew of the testator as the said J. B. should think most deserving, &c. with a residuary clause, whereby he gave and bequeathed to his wife, all his plate, china, household goods, cattle and chattels, of what nature and kind soever they be, and every individual he should be possessed of at his decease, that is not otherwise disposed of above; and made her his residuary legatee and sole executrix.
Two questions arose;—one between the children of the nephew and her, on this ground. They contended, that the trust created for them should not fail, because of the death of the trustee, in the life-time of the testator, and without making any selection; she, that a selection was absolutely necessary, in order to designate the person who should take, without which the bequest became void. And the other question was between her and the next of kin, (who were co-defendants with her,) and who contended, that if the plaintiffs did not take under the will, it was not given by the residuary clause; as it was impossible to suppose that the testator, when he gave the residue, did not imagine he had disposed of this part of the estate to particular classes of persons, and so could not mean to include it in the residue.
With respect to this point, the Master of the Rolls said, “it is too clear in favor of the residuary legatee. The next of kin contend, that this is not sufficiently disposed of; but the testator has given to the residuary'legatee all *203 that is not sufficiently disposed of. If he has not perfectly disposed of it, then she takes it. No man supposes his legacies will lapse, or will not take place. It is the case of all lapsed legacies.” On the other point, however, the decree was for the plaintiffs. If this trust had not been supported, then the case would simply have been one of a lapsed legacy, and would have fallen under the- head of a general residuary legatee taking a lapsed legacy.
But the question before us seems to belong to a different description of cases; that is, to those cases where, in consequence of a particular enumeration of certain articles, with other words intending to give a residue, such residue shall be restrained to things of a like kind, and at all events not, to extend to real estate, if such seems to be the fair interpretation of the will. It is said, that this doctrine, and these cases, will not apply to a general residuary clause, of the nature of that in this will; but applies to specific bequests of certain things enumerated, with a residuary clause simply intended to cover things of the same kind, not particularly recollected or enumerated.
It is true, if the residuary clause is clearly broad enough, and appears intended to cover every thing, as well real as personal, an enumeration of specific things will not restraiii it; but it is begging the question to say, that the clause under consideration is of that kind. If such was the intention of the testator, then, to be sure, there is an end of the question. Clauses of this kind are sometimes more, sometimes less, broad; sometimes more, sometimes less, clear.
If a testator gives to A, specific legacies, and also to B, C, and D; and in a general clause,.gives the residue to A, lie is undoubtedly residuary legatee of every thing not perfectly disposed of. But, when certain things are left to A, and in the same clause the residue is given to him, it is either a general residuary clause to him, of every thing not perfectly disposed of, or to be construed and restrained to things of the like kind, according as a sound and just construction of the whole will demands. Thus, one be *204 queatbs to A, all his goods, chattels, household stuff, furniture, and other things, which then were, or should be, in the house at his death. Ready money in the house did no{. pass_ Other things shall be intended of the like nature with those mentioned. This was not in the nature of a general residuary clause; but, by general words it was intended to give things not enumerated, or perhaps thought of, and these words were so restrained. 1 Eq. Cas. Abr. 201, pl. 14.
So in the case of Cooler. Oakley, 1 P. Wms. 802, the testator was on ship-board, and had been long beyond sea. His father was dead, which he knew, but did not know of his mother’s death. From each he derived a considerable lease-hold estate, together with his brothers and sisters, but was ignorant of his father’s will. By his will, he gave his mother (if alive) his gold rings, buttons, and chest of clothes; and to his loving friend F. G. (who was on board with him) his red box, arrack, and all things not before bequeathed; and made him his sole executor. It was insisted on behalf of the brothers and sisters, that here being an express legacy given to the executor, it could not but be presumed, that if he intended to give him his share in the lease-hold premises, he would have mentioned them; and if he did not know that he had any share in them, then it was plain that he did not intend to pass them by his will; but mere personal things only, sueh as were on ship-board; things ejusdem generis: that it was to be intended that he did not know he was entitled to any part of his father’s lease-hold estate, as in all probability he would have given some share thereof to his mother, to whom he gave, and for whom he seemed to have designed, the most valuable part of his substance. It was to be considered too, that F. G. was a mere stranger, and the testator had brothers and sisters.
It was decreed, that the executor was trustee of the surplus for the brothers and sisters; but that with respect to the buttons, rings, &c. given to the mother, they were lapsed legacies, and should therefore fall to him.
*205 Here is the case of a residuary clause broad enough to cover every thing, but which, being coupled with a speeific bequest, was restricted to things of the like kind, except so far as to cover the common case of a lapsed legacy.
This construction too, was principally founded on matters extraneous to the will; for surely, it did not proceed on the broad ground, that in every such case, the residuary part of the clause is to be restrained to things of a like kind. The extraneous matters were—his probable ignorance that his father had left him any thing in his will; but as he knew of his death, he might have supposed he had; his ignorance of his mother’s death; the residuary legatee being a stranger; his mother the principal object of his bounty; his leaving brothers and sisters; and that, consequently, under all these circumstances, he could not have intended to give any thing, except his red box, &c., or things of that kind on ship-board.
This ease shews, that however strong the residuary clause, as of all things not before bequeathed, if coupled with a specific bequest, it may be limited to things of a like kind, if such, under all the circumstances, appears to be the true construction of the will. These circumstances will of course vary in each particular case; but the propriety of giving such construction, if it can be fairly done, however broad and general the residuary part of the clause be, seems to be settled in this case.
The strongest and most pertinent case which I have been able to see (for I have not had access to many of the books to which we have been referred) is that of Timewell v. Perkins, 2 Atk. 102.
One question in that case arose under one clause of the will of John Hitchens, in these words; “Item all my freehold land and hop-grounds, now in the occupation of widow Leach, and all other the rest and residue and remainder of my estate, consisting in ready money, plate, jewels, judgments, mortgages, &c. or in any other thing *206 whatsoever or wheresoever, I give unto my dearly beloved Arabella Hitchens and her assigns forever.”
The question was, whether other lands of the testator passed to-her, or descended to his heir at law; who, I understand, is the defendant, Sarah Perkins; and that Mary Timewell is her half sister, and daughter of Arabella, the devisee above, by another husband; she claiming the lands as devisee of her mother.
Justice Fortescue says, “There is no doubt but the words to Arabella and her assigns forever, will carry the fee to her, without the word heirs. It has been contended for the plaintiff, that the preamble of the will, as touching the temporal estate with which it has pleased, God to bless me, I give and bequeath, &tc. shew plainly the testator intended to dispose of his whole estate, and that the Court will never intend an intestacy of any part; and that the word estate will include lands as well as personal estate, and though coupled with words applicable to personal estate, will pass freehold. ”
“Although it would be stronger if the word real had been added, yet, however, this will not do, unless there are some words that shew the intention to pass the real estate; or the Court will intend an intestacy, in favor of the heir at law.”
“The word estate itself, indeed, may include as well real as personal; yet, when the testator has expressed himself, by such words as are applicable to personal only, I cannot intend he meant the real estate. Whatsoever, and wheresoever, must be confined to things antecedent, and is restrained to the hop-grounds, and lease-holds; for if he intended to give his wife all his real estate, why did he mention only the Essex estate ? Estate, where it is only coupled with things that are personal, shall be restrained to personals.” For this, he cites the case of Wilkinson v. Meream, Cro. Car. 447, 449; and Sir William Jones’ Rep. 380; which, he says, is thus stated in Roll’s Abridgment, 334, pl. 14; “that if a man seised, in fee, of lands, *207 and, also, possessed of certain leases of lands, devises his leases to J. S. and then devises to his executor all the residue of his estates, mortgages, goods, &c., his debts paid, &,c. this will pass a fee to the executor, by the word estates being coupled with the word goods.” But, he adds, it appears to have been otherwise determined, on searching the record of the judgment. He proceeds, “I think the present is a strange ease, because though the word possessed is not mentioned, yet there are other words which make it stronger. For here the word estate is expressly confined to personals, as plate, jewels, &c. which are all personal, and therefore, I think, the residue of the real estate does not pass.”
But, supposing it would admit of doubt, yet certainly the heir at law ought to be preferred, unless the intention of the testator to exclude him, appears exceedingly plain.
In our ease, as in this, one question relates to real estate undisposed of by the will, if not covered by the residuary clause. In it the testator bequeaths to his friend Doctor James Dabney, all his books, medicine and shop-furniture, and all the estate not before devised, including his gig and saddle horse. The word estate consequently occurs here. In some respects, this residuary clause is, perhaps, more strong in favor of the appellee, than the case last cited, in favor of the wife. There the word “consisting,” follows the words “rest and residue, &e.” and that was relied on by the Judge. But in other respects, the words there are stronger; for after the word “consisting” of ready money, &c. follow the words, “or in any other thing whatsoever or wheresoever.” And the case cited from Roll’s Abridgment seems, in every part, not stronger than ours, in favor of an intestacy.
Again, in our ease, as in that of P. Williams, 302, the residuary legaf.ee, or devisee as he claims also to be, is a stranger, and by no means an object of large bounty, so far as we may judge from the enumerated articles. In the case from Alleyns, the residuary legatee was the wife and the object of large bounty, and the words in her favor, I *208 think, taken all together, are broader than those in favor 0f the appellee here, especially when we take in the last words, “including my gig and riding horse.” Why did he not say also, if he so intended it, “my slaves at Whitings, my shop in which the said medicine, books and furniture are, my lot and stable where my gig and horses are, and my plantation and slaves, in which my aunt has a life-estate?” Or, if he intended such estates as these to pass, without specification, how could he suppose it necessary to specify his gig and horses ? Can a limited bequest of this kind, in which care seemed to be taken to enumerate every thing intended, because some general words are used, calculated to cover every small thing so intended, be for a moment supposed as intended, to give away to a stranger large estates of lands, to say nothing of the slaves? I think not, and could only be induced to give such enlarged (and to my mind, unreasonable) interpretation, in consequence of some rules of construction, which may be considered as having grown into law.
I at first thought these were against me. But the more I reflect on the subject, the better I am satisfied, that there are none such; and that the cases above, point out the true and rational course, viz. that an intestacy, in such cases, will be presumed, at least as to lands, and as to personals too, except as to things of the same kind, or lapsed legacies, where no intestacy can be presumed.
I wish I was as sure that I have violated no sound rule of construction, as I am that, in making this decision, I have done no violence to the intention of the testator.
Fpr these reasons, as at present advised, I am for reversing the decree.
Judge Cabell:-
In the case of Puller v. Puller, ante 88,1 had occasion to give my opinion, as to the kind of evidence to which we may properly resort, for the purpose of discovering the in *209 iention of a testator. I have seen nothing in the investígations to which the present, case has led me, calculated to change that opinion. I beg leave to refer to it, therefore, in order to shew my views of that subject.
As to the slaves in controversy, I concur with the Judge who has preceded me, that< they passed, by the will, to the Fifes.
The only remaining question in the cause, relates to the money decreed to be paid to the appellee, for the rent of the Urbanna lots.
It is contended, on the part of the appellant, that these lots were not devised by the will, to the appellee., and that, therefore, he can have no title whatever, to their rents.
If they be devised to the appellee, it must be by force of the following clause, “I bequeath to my friend Doctor James Dabney of Gloucester, all my books, medicine and shop-furniture, and all the estate not before devised, including my gig and saddle horses.”
The case of Kennon v. M’Roberts, 1 Wash. 96, shews, that however general, in point of form and expression, a residuary clause may be, yet if it appear, from other parts of the will, that a particular estate or interest was not intended by the testator to fall into the residuum, it shall not be embraced by the residuary clause, although no other disposition thereof may have been actually made by the will. For, in that case, it was decided, that a general residuary clause, did not embrace a reversionary interest in a tract of land; because it was evident, that the testator thought he had conveyed it otherwise in the body of his will, and could not therefore intend to make it a part of the residuum. The principle settled in Kennon v. M’Roberts, is not at all at variance with the acknowledged law, relating to lapsed legacies. Every testator is presumed to know, that if his legatee dies before himself, the legacy lapses and becomes as ineffectual, as if it had never been made; and that his will speaks as at the time of his death.
When, therefore, lie makes a general residuary clause, as *210 to all his estate not before disposed of, even he must be presumed to intend that it shall embrace the case of a lapsed ineffectual legacy.
General expressions in a residuary clause, may also be controlled and limited by the intention of the testator, as collected from the clause itself; and they will always receive a restricted construction, whenever it shall appear that he intended them to have a particular application. It is readily admitted, that the words “ all the estate not before devised,” are broad enough, in themselves, to include real as well as personal estate. But the construction must be made on the whole clause, and not on a part only. And here it may not be improper to remark, that in determining the extent of this clause, I pay no regard to the testimony of Samuel TV. Sayre. If the testator intended to give to the appellee, all his estate, of every, kind whatsoever, not before disposed of, he might have accomplished that object, by the use of general expressions to that effect, without any special enumeration of particular things. But although a special enumeration be not necessary to give any additional effect to general expressions, yet such enumeration may, under circumstances, sometimes limit and control the general expressions, by giving them a particular application. If the testator intended, by the clause in question, to give to Doctor Dabney, valuable houses and lands, as well as persona! property of comparatively small value, it is very singular, that in the partial enumeration to which he resorted, he should have confined himself to the articles of inferior value. Testators usually pursue a different course. The most important and valuable articles press upon the mind, and enter first into the. enumeration; whilst those of inferior value are left to the operation of the general expressions. And, in this case, it would be passing strange, that if the testator intended to give the shop, as well as the shop furniture, he should be silent as to the shop, when he expressly mentions the furniture. This consideration, of itself, would not be conclusive to shew *211 the intention of the testator; but when taken, in this case, in connexion with the latter part of the clause, it removes all doubt from my mind. After specially enumerating the books, medicine and shop-furniture, he adds, “ and all the estate not before devised, including my gig and saddle horses.” The testator certainly knew what he intended by the terms “all the estate not before devised.” If he intended to embrace every thing not before devised, he surely would not have added the words “ including my gig and saddle horses?’ for they would have passed by the general terms previously used. The addition rf these words, however, shews that the testator intended by them, to give something which the previous general expressions did not embrace. And if the words “all the estate not before devised,” did not apply to the gig and saddle horses, (which bad not been before devised) it is impossible to give them any rational interpretation, but by confining them to things of the same nature with those just enumerated, viz. the books, medicine, and shop-furniture. That must have been the intention of the testator, and it explains, and gives elfect to every part of the residuary clause, and particularly to that part relating to the gig and saddle horses, which would otherwise be useless and senseless. His object was to give the books, medicine and shop-furniture, and every thing else of the same nature; but he intended, moreover, to give the gig and saddle horses; and therefore he expressly mentioned them. This is the utmost extent of his intention; and it is not for us to carry it farther. The caso of Timewell v. Perkins, 2 Atk. 103, is a strong authority to this point. The houses and lots, therefore, did not pass by the will to Doctor Dabney; and, I therefore think the decree erroneous as to the money decreed to bo paid for the rents.
From the view I have taken of the clause in favor of Dr. Dabney, I should, of necessity, exclude him from the slaves at Whitings, even if I did not think that they had been actually given to others.
I am of opinion to reverse the decree.